UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **BRIAN FISCHLER**, *individually and on behalf of all others similarly situated,*<br><br>    Plaintiff,<br><br>  v.<br><br>**FANDUEL, INC.,**<br><br>    Defendant. | **Civil Action No. 16-00989**<br><br>**CLASS ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

INTRODUCTION

1.      Participants ("Players") pay fees to FanDuel to enter contests, in which they assemble rosters of athletes and pit their respective "teams" against each other hoping to win money. FanDuel recruits Players through a barrage of ubiquitous video, Internet, and print advertisements – it has spent tens of millions of dollars on such advertisements. FanDuel's incessant recruitment of new Players is critical to its business model. This class action challenges the deceptive nature of that recruitment effort – FanDuel's false promise to match new Players' initial account deposits up to $200.

2.      To enter contests, Players must set up an account and deposit funds. FanDuel promises that Players who sign up will receive a limited-time 100% deposit match. For example, FanDuel represents that when a new Player deposits $200 in a FanDuel account, FanDuel will "match" the deposit "dollar for

dollar" with an additional "free" $200. *See*

https://www.youtube.com/watch?v=B0pd0R1S1ec;

https://www.youtube.com/watch?v=cCqaWIvJCpk.

3.     But a new Player who deposits $200 expecting to have $400 immediately available learns only after the fact that the deposit match, like the games, is a fantasy. The only way to get the "free" deposit match is to pay thousands more in entry fees to play additional contests. By entering contests, Players slowly earn back their deposits through an almost inscrutable process by which points are subsequently "released" to Players at a rate of 4%. A Player depositing $200 must pay $5,000 in additional entry fees to realize the promised $200 deposit match.

4.     As designed and implemented, FanDuel's promise to match a Player's deposit upon registration as a new Player is blatant deception, with an undisclosed condition requiring Players to spend 25 times their initial deposit and likely enter hundreds of competitions to realize the 100% match FanDuel promises.

5.     This class action seeks declaratory, injunctive and monetary relief on behalf of Players victimized by FanDuel's cynical and deceptive business practices.

## PARTIES

6.     Brian Fischler is an adult residing in Queens County, New York.

7.      FanDuel, Inc., is a Delaware corporation with its principal place of business at 19 Union Square West, Ninth Floor, New York, New York 10003. FanDuel is a web-based fantasy sports game and is one of the largest fantasy sports companies in the industry, servicing the United States and abroad.

## JURISDICTION AND VENUE

8.      This Court has personal jurisdiction because Defendant is domiciled in New York and because it transacts business and commits tortious acts in New York, as alleged in this Complaint.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d).

9.      Venue is appropriate pursuant to 28 U.S.C. § 1391 because FanDuel's principal place of business is New York, New York, a substantial portion of the events giving rise to the claims occurred here, and FanDuel chose this venue for any non-arbitration issues in its contract with Mr. Fischler.

## FANDUEL'S DECEPTIVE MARKETING SCHEME

10.     Online fantasy sports contests are a multibillion-dollar industry. FanDuel and DraftKings are the two behemoths of the industry, each valued at more than $1 billion with over two million registered Players.

11.     Although FanDuel ads promote the idea that any "Regular Joe" can win big money participating in their fantasy contests, the truth is that FanDuel's structure allows only a small cadre of elite Players to capture the vast bulk of the prize money over the course of a season. These "whales" use sophisticated statistical modeling and computer algorithms which automate the contest entry

process, allowing them to manage hundreds of entries at once and identify the weakest opponents.

12.     The result is predictable. According to a study of the industry by *Sport Business Journal*, in the first half of the 2015 MLB season at least 85 percent of the Players lost money.

http://www.sportsbusinessdaily.com/Journal/Issues/2015/07/27/Opinion/From-the-Field-of-Fantasy-Sports.aspx.  Disgruntled new Players only realize that FanDuel's promised deposit match is illusory after making their initial deposit, when they see the "match" incrementally trickle in, at amounts that are a fraction of FanDuel's promise.

**FANDUEL'S DECEPTIVE DEPOSIT MATCHING PROMISES**

13.     To continue attracting new Players, FanDuel advertises ubiquitously, and induces them to put down, $100, $200, or other deposits to obtain its illusive "match." According to *The Wall Street Journal*, it had the most appearances of any brand during NFL games at the start of the 2015 season and, together with DraftKings, it was at one point one of the biggest advertisers on television. http://www.wsj.com/articles/are-draftkings-and-fanduel-bombarding-fans-with-too-many-ads-1442520546.

14.     The start of the NFL season in September 2015 made that month the sweet spot for Player recruitment. FanDuel collected roughly $30 million in entry fees in the first week of the NFL season alone, according to *Bloomberg Business*.

http://www.bloomberg.com/news/articles/2015-09-10/you-aren-t-good-

enough-to-win-money-playing-daily-fantasy-football. This is as much as all of

the sports books in Las Vegas combined in the same time frame.

**FANDUEL USES A FALSE SENSE OF URGENCY TO INDUCE PLAYERS TO SIGN UP BEFORE THEIR DEPOSIT BONUS WINDOW CLOSES**

15.     New visitors to FanDuel's official website are prompted to a

"Create your Account" page after attempting to access the website.



(Last accessed January 12, 2016, https://www.FanDuel.com).

16.     If a Player clicks on the "Play Now" button of the official website

after creating a Player name and password, the Player is taken to a deposit page,

which promises to double your cash. The doubling offer is presented as a limited

time offer, the urgency of which is reinforced by the image of a 10 minute

countdown "clock" that ticks down the seconds until it supposedly expires.

FanDuel has recently changed the use of the ticking clock from a reference to the

bonus offer to a reference to the next contest. But the original clock, displayed

during the relevant time period, can be viewed at 2 minutes 51 seconds at

https://www.youtube.com/watch?v=37RWLYmbYyE, and in the image from

the YouTube clip below.



17.    The deposit page contained large boxes from which Players chose

how much to deposit. Below these dollar amounts appeared the corresponding

"matching" amounts.

18.    Players, rushed by FanDuel to enter their information before the

clock runs out, would have to scroll down to the asterisked footnote in small

print at the bottom of the page to find the following explanation: "Your deposit

bonus unlocks as you play over time. How it works."



(Last accessed January 13, 2016,

https://www.fanduel.com/p/AddFundsFtd?signup=1&trackSignup=1&userna
me=sldjfewiri).

## FURTHER DOWN THE RABBIT HOLE, HOW
## DEPOSIT MATCHING WORKS REMAINS INSCRUTABLE

19.     This fine-print footnote does not explain how frequently one must play to unlock the deposit; how much of the deposit is unlocked each time one plays; how long it may take to earn the deposit; or, importantly, that Players cannot get the promised deposit match unless they pay much more in entry fees. Nor does it explain any restraints on withdrawing the bonus. Even if the Player reads the footnote, and clicks on the link for more information – despite the ticking countdown clock – the "How it Works" link sheds scant light on the deposit bonus policy. The first paragraph, answering the question "How does the deposit bonus work?," essentially repeats the inscrutable footnote on the deposit page, and states bonuses are earned "gradually" and are "released automatically."

## Deposit Bonus

### How does the deposit bonus work?

Deposit bonus is offered to users upon first deposit and via special promotional offers. Bonuses are earned gradually after you enter and complete paid contests. As you play and earn the bonus, the cash you earn is released automatically into your account, reflected in your account balance, and made available for play or withdrawal under the same terms as all funds in your account. Your remaining deposit bonus available to be earned is shown in your account menu as 'Pending Bonus' and in your My Account area.

(Last accessed January 13, 2016, https://www.fanduel.com/p/AddFundsFtd?#).

20.     The explanation then adds a paragraph answering "How Fast does the deposit bonus become real cash?." But the answer adds little to a new

Player's understanding of the deposit match; instead it merely states bonuses are

"released as real cash at a rate of 4% of the entry fee of the contest you enter" and

offers one example. This unsatisfactory explanation provides new Players with

no concrete understanding of how long it will actually take to earn back the

deposit match, how much money a Player must spend to earn it back, and if

there are any restraints on recovery of the deposit match once earned.

How fast does the deposit bonus become real cash?

Gradually releasing bonuses as you play prevents fraud and discourages multi-accounting. Deposit bonus is released as real cash at a rate of 4% of the entry fee of the contest you enter. For example, if you enter a $25 contest, $1 of deposit bonus will be released into your main funds account. Users collect deposit bonus upon settlement of the contest entered. If a contest or entry is canceled, your entry fee will be refunded and no bonuses will be earned.

(Last accessed January 13, 2016, https://www.fanduel.com/p/AddFundsFtd?#).

21.     The explanation adds, under "What are the benefits of deposit

bonuses?" that "First time deposit bonuses do not expire so the funds are

available until they've been earned and spent." A natural reading of this is that

there are no time constraints on new user bonuses.

What are the benefits of deposit bonuses?

Deposit bonus rewards loyal users who play consistently on FanDuel. First time deposit bonuses do not expire so the funds are available until they've been earned and spent.

*Please note that special offers and reÂload bonuses may carry an expiration date to be used. If the indicated time lapses due to inactivity and your special bonus was retracted, please contact customer support.

If you have further questions about bonuses, please refer to our Terms of Use for a full explanation or contact us.

(Last accessed January 13, 2016, https://www.fanduel.com/p/AddFundsFtd?#).

22.     But clicking on the Terms of Use link prompts the user to a lengthy Terms of Use page that does, in fact, appear to impose time constraints on Players: (1) "new users" can only withdraw their bonuses once they have entered into games; and ambiguously, (2) "unless otherwise stated, any unconverted pending bonus remaining in a player's account 45 days after it has been initially credited can be removed by FanDuel."

**Bonuses and Promotions**

We frequently offer bonuses to newly depositing users and for other marketing purposes. Pending bonus is converted into a player's cash account as the player enters real money contests. Unless otherwise stated, any unconverted pending bonus remaining in a player's account 45 days after it has been initially credited can be removed by FanDuel. Any cash bonus a new user receives is for entry into competitions on FanDuel and can only be withdrawn if they have been previously entered into at least one game. Additionally, if a user immediately withdraws money after a deposit which delivers a deposit bonus then the bonus will be retracted. In the event of abuse of the bonus system by any user, FanDuel reserves the right to retract your user bonuses.

We frequently offer cash rewards for players competing in "Beat The Expert" competitions and Giveaway/Freeroll tournaments. FanDuel reserves the right to reclaim these funds if players do not use them to enter real money contests within 1 month of their initial crediting. These funds can be used to enter real money contests but cannot be immediately withdrawn.

(Last accessed January 13, 2016,

http://web.archive.org/web/20141122001525/https://www.fanduel.com/terms; https://www.fanduel.com/terms).

23.     Even the relevant Terms of Use section above does not clarify how many games a Player must play to earn enough points to get the full deposit bonus. Nor does it explain that in stark contrast to advertisements and previous pages to act quickly so they can double their "free" cash, it is impossible for

Players to double initial cash deposits of $100 or $200 without depositing and paying thousands more in entry fees.

24.     There is no realistic way for a Player to enter the registration information, navigate through the links, find the relevant section of the Terms of Use, and correctly interpret it within the ten minutes provided.

### THE ACTUAL MATH IS DEPRESSING: PLAYERS MUST SPEND 25 TIMES THEIR INITIAL DEPOSIT TO EARN THEIR DEPOSIT "MATCH"

25.     In contrast to the representations that when Players deposit cash, FanDuel will give them a "free" deposit match, the only way to get a full matching bonus is to spend *25 times* that initial deposit on contest entry fees. Its so-called "match" bonus is not a match in any sense of the word—it is exceedingly expensive and is skewed 25 to 1 in favor of FanDuel.

26.     For example, a Player who deposited $100 must pay $2,500 in entry fees to receive a full match of his initial $100 deposit because FanDuel only "releases" the deposit match at a rate of 4%. And doing so would likely require entering into hundreds of contests.

27.     Entry fees range from around $1.00 to over $5,000, with many fees in the $1 to $5 range. A Player of $1 contests would have to enter (and win enough to stay afloat) 2,500 contests, four a day for twenty months, to earn his $100 "match" deposit bonus. Even if a Player entered solely $100 contests, he would have to do so 25 times over to earn his $100 "match" deposit bonus, spending a total of $2,500 in entry fees.

28.     Not only does FanDuel fail to disclose these and other material conditions to obtaining the so called deposit match, it misrepresents that the deposit is automatic and immediate when it is anything but.

### FICTIONAL "PROMO CODES" DEPICTED IN INTERNET VIDEOS FURTHER MISLEAD PLAYERS

29.     FanDuel's misleading and deceptive representations saturate the Internet. YouTube is one of the many forums FanDuel has exploited to mislead the public and generate new business.

30.     One strategy FanDuel and its affiliated entities employ is offering special deals, like: (1) time sensitive "promo codes," (https://www.youtube.com/watch?v=N7GR6wB6m_U); and (2) "special" website access, like www.thesportsgeek.com/go/fanduel. (https://www.youtube.com/watch?v=gfkHrDAmjBE). These marketing ploys are misleading—they are illusory because the "special deals" repeat FanDuel's normal policies regarding deposits. The illusory deals are intended to induce Players to join FanDuel under the false pretense they are receiving a bargain others are not.

31.     These YouTube advertisements double down on FanDuel's misleading matching deposit ploy. For example:

   a.   https://www.youtube.com/watch?v=B0pd0R1S1ec — "Try FanDuel today and we'll *match the first deposit dollar for dollar up to 200 bucks*. With FanDuel *you get your winnings right away*. Go to FanDuel.com . . . *to get up to 200 dollars free*." (18–28 seconds)

b.  https://www.youtube.com/watch?v=cCqaWIvJCpk – "Deposit now and we'll match it up to 200 bucks . . . *that's 200 dollars free*." (51–57 seconds)

c.  https://www.youtube.com/watch?v=gfkHrDAmjBE – "It matches your first deposit. So let's say you deposit 20 dollars for the first time, *you're going to get 20 dollars free*. If you deposit 100 dollars, *you'll get 100 dollars free*." (3 minutes 48 seconds– 3 minutes 57 seconds)

d.  https://www.youtube.com/watch?v=p2lmIY8YE2U —Large bold letters at the bottom of the YouTube clip state **"$200 free"** and starting at 33 seconds the video itself also displays "$200 FREE" for the remainder of the video.

32.     But FanDuel's deposit bonus is neither "free," a "dollar for dollar" match, nor received "right way" since the Player must pay many times his initial deposit in entry fees to receive the promised bonus. FanDuel's representations are not only misleading, but false.

FACTS PERTINENT TO MR. FISCHLER

33.     Brian Fischler joined FanDuel on November 22, 2014.

34.     On that date he deposited $100 into his FanDuel account, and based on the website representations, and other advertisements, was reasonably led to believe that his $100 would be doubled to $200 immediately.

35.     Mr. Fischler has only received $6.16 in deposit bonuses. Mr. Fischler would need to spend a total of $2,500 in entry fees to receive the $100 FanDuel promised him.

**FANDUEL'S OPPRESSIVE AND UNFAIR TERMS & CONDITIONS ARE NOT AGREED TO, ATTEMPT TO ABROGATE BASIC LEGAL RIGHTS, AND CREATE AN ILLUSORY CONTRACT**

36.     Each prospective FanDuel Player must register and create a FanDuel account using the same steps and viewing the same screens as Mr. Fischler.

37.     FanDuel does *not* prompt Players to check a box agreeing to its "Terms of Use." Instead, only after clicking "Join Now," are they directed to a "Create your Account" page, which contains a small, black hyperlink to a "Terms of Service" at the bottom of the page.



(Last accessed January 13, 2016, https://www.fanduel.com/).

38.     Even after clicking "Play Now," no other reference is made to the

Terms of Use unless a Player clicks "How it works," then scrolls down to the

small Terms of Use hyperlink on the next page for "further questions."



(Last accessed January 13, 2016,

https://www.fanduel.com/p/AddFundsFtd?signup=1&trackSignup=1&userna

me=bcolloway1122#).



(Last accessed January 13, 2016,

https://www.fanduel.com/p/AddFundsFtd?signup=1&trackSignup=1&userna

me=bcolloway1122#).

39.     Thus, Players have not agreed to the Terms of Use, because those

terms are contained in an unenforceable "browsewrap" format.

40.     FanDuel's Terms of Use also contain several grossly one-sided

provisions, which purport to contract away almost all conceivable legal

obligations FanDuel would owe to the Players, while reserving to itself a number

of draconian measures it can impose on the Players, and which it can invoke

with virtually unfettered discretion.

## TOTAL DISCLAIMER OF LIABILITY

41.    FanDuel purports to disclaim liability for *any* wrongs it may commit. FanDuel requires Players to "agree to release and to indemnify, defend and hold harmless FanDuel" and any associated entities or people "from and against *any and all* losses, liabilities, expenses, damages, costs, . . . claims or actions *of any kind* . . . ." FanDuel further purports to disclaim "neither FanDuel nor its Suppliers or licensors will be liable to you for any direct, indirect, incidental, special, consequential, punitive, exemplary or other damages of any kind . . . ."

42.    These are the Terms of Use that Players are ostensibly subject to by virtue of using the FanDuel website, regardless of the terms' one-sidedness, unconscionability and illegality, and the Players' lack of actual knowledge of and lack of affirmative assent to those terms. To lock in Players completely, FanDuel purports to have them waive their rights entirely and FanDuel essentially disavows responsibility for any obligation running to the Player.

## TOTAL DISCLAIMER OF WARRANTIES

43.    FanDuel's complete disclaimer of warranties disavows every conceivable basis upon which a reasonable Player would rely in using the website and FanDuel's services:

> You expressly understand and agree that your use of the Service is at your sole risk. The Service (including the Service and the Content) are provided on an "AS IS" and "as available basis, without warranties *of any kind*, either express or implied . . . . (emphasis added).

44.     FanDuel does not even warrant that its website and contests are legal, rather, it puts the burden on the Player to ensure the legality of the contests that FanDuel is charging a fee to play: "FanDuel makes no representations concerning any Content contained in or accessed through the Service, and FanDuel will not be responsible or liable for accuracy, . . . legality, or decency of material contained" on FanDuel.

### UNFETTERED DISCRETION TO ALTER THE CONTRACT AND REVOKE PLAYERS' RIGHTS

45.     FanDuel's Terms of Use purport to give it unfettered discretion to disqualify any Player, refuse to award prizes, require the return of any prizes or take other action it deems appropriate if it deems in its "sole discretion" a Player to have engaged in improper conduct.

46.     FanDuel reserves the right to unilaterally change the terms of the agreement. "FanDuel reserves the right, at its sole discretion, to modify or replace the Terms of Use at any time." "Use of the Services by you after any modification to the Terms constitutes your acceptance . . . ." and FanDuel does not give notice unless in its sole discretion it determines it should.

### UNFETTERED DISCRETION TO EXPLOIT

47.     According to its Terms of Use, FanDuel has unfettered use of winners' names, voices, likeness and photographs to serve its own promotional ends. Winners must "from the date of notification of their status as a potential winner, and continuing until such time when notified that they no longer need to

do so, make themselves available to FanDuel . . . without additional

compensation." Failure of winners to enter into and comply with a publicity

agreement "can result in disqualification" from winnings.

### FANDUEL'S ARBITRATION PROVISION IS UNENFORCEABLE BECAUSE ITS UNFAIR AND DECEPTIVE PROVISIONS VIOLATE NEW YORK LAW

48.     Buried within FanDuel's Terms of Use is a hidden, unenforceable

arbitration provision—which Players need not read nor even affirmatively click a

box to indicate they have read it. FanDuel has not conspicuously brought the

arbitration provision to the Players' attention. If a Player is of the likely few who

actually know of and review the Terms of Use, the arbitration provision can only

be discovered if a Player navigates through windows, clicks an inconspicuous

hyperlink, and reads through 72 paragraphs of boilerplate legalese. FanDuel

intentionally buries the actual provision in the middle to bottom of the

agreement.

49.     Just as grossly one-sided as other provisions in the Terms of Use,

the arbitration provision purports to require Players to first use FanDuel's

customer service department and then to arbitrate "as the sole means to resolve

claims," unless filed in small claims court or related to intellectual property.

50.     The arbitration provision is unclear because it also provides that

"for any dispute not subject to arbitration" the personal and exclusive

jurisdiction of and venue in the federal and state courts are located in New York,

NY. And the "Terms and the relationship between you and FanDuel shall be governed" by New York law.

51.     While FanDuel attempts to garnish its arbitration provision with fair terms—like pointing to certain rights under the Commercial Arbitration Rules – its attempts are specious and belied by other provisions already mentioned requiring Players to assume all liability and indemnify FanDuel for any losses "of any kind whatsoever arising or resulting from" a Player's "use of" FanDuel.

52.     FanDuel's attempt at penalizing Players challenging it, including its arbitration clause, is designed to and has a chilling effect upon consumers, and violates the public policy behind New York consumer protection laws, rendering the arbitration clause unconscionable and unenforceable.

### CLASS ALLEGATIONS

53.     The class is composed of all persons in the United States who created an account on FanDuel and deposited money after FanDuel began offering any form of "deposit bonus" or other promotion advertising a matching of the deposit. The class excludes citizens of Arizona, Iowa, Montana, Louisiana, and Washington.

54.     Based on the volume of FanDuel's Player registrations, the prospective class numbers in the hundreds of thousands, making joinder of all members impracticable. The exact size of the proposed class and the identity of the class members are readily ascertainable from FanDuel's business records.

55.     There are questions of law and fact common to the class, which predominate over any questions affecting only individual class members. The principal common issues regarding the class include: whether FanDuel's marketing is deceptive and misleading; whether its failure to provide matching deposits breaches its contracts with Players, or breaches its warranties; and whether these practices violate New York General Business Laws.

56.     There are no difficulties likely to be encountered by the Court in the management of this proposed class action. There are no individual questions, other than those which can be determined by ministerial inspection of FanDuel's records, and the issues of liability are determinable entirely from the face of the operative documents.

57.     Plaintiff's claims are typical of those of the class he seeks to represent, and he will fairly and adequately protect and represent the interests of the class. There is no conflict between Plaintiff and the proposed class.

58.     A class action is superior to other methods for the fair and efficient adjudication of this controversy. Because the damages suffered by the individual class members may be relatively small compared to the expense and burden of litigation, it would be impractical and economically unfeasible for class members to seek redress individually. Finally, the prosecution of separate actions by the individual class members, even if possible, would create a risk of inconsistent or varying adjudications regarding the individual class members against FanDuel.

59.    Plaintiff is represented by counsel competent and experienced in both consumer protection and class action litigation.

### CAUSES OF ACTION

### COUNT I: BREACH OF CONTRACT

60.    FanDuel promised that in exchange for an immediate deposit, it would double the Player's cash, up to $200. Players who made such a deposit accepted this offer, entered into the deposit matching agreement because of the offer, and created a deposit matching contract with FanDuel.

61.    FanDuel breached the contract with class members when it failed to immediately match class members' initial deposits and require payment of additional entry fees.

62.    Class members were harmed by FanDuel's breach.

### COUNT II: UNJUST ENRICHMENT

63.    By accepting class members' initial deposits, then failing to match them as promised, FanDuel was unjustly enriched.

64.    FanDuel accepted class members' deposits knowingly and with awareness that it did so unjustly.

65.    Class members suffered a loss as a result of FanDuel's unjust enrichment.

### COUNT III: BREACH OF EXPRESS WARRANTY

66.    FanDuel makes express representations through advertisements and its website that it will match a Player's deposit up to $200, in cash, free, once

a deposit is made, and such representation goes to the basis of the bargain it made with class members. FanDuel's representations constitute an express warranty.

67.    FanDuel breached its express warranty by failing to immediately provide the promised deposits, causing injury.

**COUNT IV: FALSE ADVERTISING IN VIOLATION OF N.Y GEN. BUS. LAW §§ 350, 350a**

68.    FanDuel used misleading and untrue advertisements to sell its services, namely that a Player's initial deposit would be matched up to $200.

69.    Such advertisements were placed before the public in New York and across the nation, and were false.

70.    Class members were harmed by such false advertisements.

**COUNT V: VIOLATIONS OF N.Y. GEN. BUS. LAW § 349**

71.    By the misconduct complained of, including inducing consumers like Plaintiff to join FanDuel under the promise to match their deposit for free upon deposit, FanDuel engaged in deceptive acts and practices in New York in violation of N.Y. Gen Bus. Law § 349. As a result thereof, Plaintiff and class members have been damaged in an amount to be determined at trial.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all class members, requests that the Court enter judgment in their favor and against FanDuel, as follows:

A.      Certification of the proposed Class, including appointment of Plaintiff's counsel as Class Counsel;

B.      An order temporarily and permanently enjoining FanDuel from continuing the unlawful, misleading, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.      Payment to class members for actual damages; any right to additional statutory damages are expressly waived;

D.      An order requiring FanDuel to pay both pre- and post-judgment interest on any amounts awarded;

E.      An award of costs and attorney's fees; and

F.      Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all claims so triable.

DATED: February 9, 2016

                                    Respectfully submitted,

                                    */s/ Kevin Barrett*
                                    Kevin Barrett (Bar Code # 2196343)
                                    kbarrett@baileyglasser.com
                                    Bailey & Glasser LLP
                                    209 Capitol Street
                                    Charleston WV 25301
                                    T: 304.345.6555
                                    F: 304.342.1110

John Roddy
jroddy@baileyglasser.com
Elizabeth Ryan
eryan@baileyglasser.com
Bailey & Glasser LLP
99 High Street, Suite 304
Boston, MA 02110
T: 617.439.6730
F: 617.951.3954